Case number 18-7159. Michael H. Holland as trustee as the U. M. W. A. 1992 Benefit Plan et al. v. Arch Coal, Inc. Appellant. Mr. Woodrum, the appellant. Ms. Shuster, the appellate. Thank you. Good morning. May it please the Court, I'm John Woodrum, I represent the appellant, Arch Coal Company in this case. The U. M. W. 1992 Benefit Plan functions primarily as an orphan plan to backstop health care benefits should retirees who are supposed to receive those benefits from their last employer cease to be able to provide those benefits. Here the plan alleges that Arch Coal is in violation of the act because it has not provided more than eight billion dollars of security to the plan. The plan's claim must be rejected for two reasons. First, the statute does not authorize, by its plain language, the plan to demand security from a related person to a 1988 signatory operator, which is the entity that the act requires to actually provide the security. The second reason is that even if a co-obligor such as Arch Coal were required to provide the security that the act says the actual signatory operator must provide, that security has been provided. As a threshold matter, this Court is tasked with resolving the party's competing views concerning the joint and several liability that Section 9712 D. 4 of the Coal Act imposes on related persons for the obligations of their affiliated signatory companies. Section 9712 D. 1 specifies that before we get into the teeth of the text of the provision, which is this, let's just put aside the text for a second. And why would Congress have created a statute under which a related entity is on the hook if the premiums aren't paid, but a related entity is not on the hooks if a security isn't supplied? Well, several reasons. First, there is in the statute a number of specific assignments of liabilities to some entities, but not to others. So there is a demonstrated structure within the act for related persons, for example, to be responsible for some obligations, but not others. For EDH signatories to be responsible for some obligation and not others. With respect to the security itself, the obligation under this act lasts for the lifetime of the people who are entitled to benefits. So it's a very long trail of liability. And certainly within the coal industry, as in many industries, there are transactions that occur where companies that have this liability, the EDH signatories, as in this case, might be sold to other third parties. So Congress was focused on making sure that the premiums were always paid, and premiums are paid on a monthly basis for the duration of the existence of the plan, so that the plan has assets with which to operate. By comparison, security is posted once, and it remains, it's irrevocable, the terms of the security say it's irrevocable. Right, but what I'm asking is, suppose the security isn't provided. Let's just imagine a world in which the situation that we're concerned with, because if that doesn't happen, the question is, can the plan go after a related entity? And what I'm not quite following is, we know what happens if the premiums aren't paid. The statute says, by everybody's admission, you can go after, the plan can go after a related entity because the premiums have to be paid. But the statute also presupposes that a security will be provided. And if security just isn't provided, why would Congress have said, well, you can go after a related entity when the premiums aren't paid, but you can't go after a related entity when the security's not provided? Because they clearly thought the provision of the security mattered, because the security is there as a backstop in case the plan needs access to some assets with which to pay the beneficiaries. What would be the rationale for drawing a distinction between the provision of the security and the payment of the premiums? The rationale would be that the ADA secretaries, by definition, were in business at the time of enactment. They were the contract signatories that existed when this entire COAC was constructed and enacted. So they were in business. There would be a right of the plan, should those companies fail to provide the security, to go into court and seek an injunction requiring them to provide it. Which is also true of the premiums. If they weren't paying the premiums, they could do the same thing with respect to the premiums. Right, but everybody agrees that related entities are on the hook for the premiums. Correct. Why wouldn't they also be on the hook for the security? Well, because there would be no need to, because they are on the hook for the premiums and the premiums are what the plan needs to conduct its operation and to pay for the benefits. Then why was security required in the first place? Well, because not every, in fact, probably the majority of companies didn't have related entities that could pick up the premium obligation if the signatory entity failed to pay the premiums. So if they ceased to pay premiums, there's nowhere to go to force a third party such as a related person to pay the premiums and to assume the responsibility for providing benefits for the actual individuals  How isn't the amount of the security required based upon the expected cost for the following year? That's correct. The plan projects... And just for that one year. Currently, that's correct. All the employees become orphans. By definition, if it goes out of business and it can't provide the benefits, then its employees become, or retirees rather, become eligible for the plan and the security was intended to provide a year's worth of coverage in that situation. And now a year's worth of coverage is no longer necessary, you're saying, in that situation? Pardon me, where there is a related entity. Where there is a related entity, the related entity essentially is the security for the plan because it now, as happened in this case, we had a couple of thousand, or a thousand, at least a thousand beneficiaries of these 88 signatory companies, subsidiaries. But something could happen to the related entity, too. So I wasn't aware that just because a related entity... Is it true that if a related entity takes over the payments, then the obligation to have the security just disappears? No, the obligation to have the security doesn't disappear. The security has already been posted. And the plan has that money. They acknowledge that they have the security that was posted by those signatories. So the only reason ARCH could ever have an obligation to provide the security would be if the related person, or the signatory company rather, never provided it, but by definition they have provided it. They have a statutory obligation to provide it. I thought your position is that even if the signatory didn't provide the security, ARCH would never have to... Exactly. That's our statutory interpretation. There's just no obligation here on the related person to provide security because it's provided, directed to be provided by the 1988 operator that actually employed the people. And it's not an amount required to be paid to the fund. It's never actually paid to the plan. It's an instrument, a security instrument that is held, but it doesn't become an asset at the plan. The only time the plan should take the money in, the security in, is if they actually end up having to provide benefits. If we don't agree with your reading of, I guess it's 9712D something, right?  If we don't agree with that, how can we find in your favor without challenging the plans having drawn down the security? By simply finding that the security was provided. It's security that was required under the Act. It was provided by ARCH Coal's co-obligor, it's 88 signatory companies, and therefore the Act was complied with. ARCH's only obligation, even if we assume that it has a joint and several liability for security that is not posted, is security that's not posted. Here the security was provided. You just made reference to co-applicants, I think. The co-applicants were the two subsidiaries, is that right? The two subsidiaries were co-applicants on the bond that the plan foreclosed, or not the bond, but the letter of credit that the plan foreclosed. Right. You also say, I think it's at 45, that the plan documents track, well, are parallel, to run parallel, as it were, to the statutory requirements as you see them, where the plan document says any bond, letter of credit, etc., shall be paid to the trust in the event that the 1988 LSO fails to meet its obligations to provide benefits. And you say, well, there's been no failure of an LSO or related person, and for that reason, the proceeds should be segregated. That's correct. That's the plan document, not the statute. The plan document, the statute, simply says that security has to be provided. It's the plan document itself that defines when they will take the security. So, I mean, I think a fair reading of this paragraph, but correct me if I'm wrong, is that you're saying that the drawdown violated the plan document. No, I don't. Well, I don't know that the drawdown violated the plan document. I think the drawdown was permitted by the commercial instrument. Well, but those can coexist. The letter of credit may have allowed the drawdown on the basis of the failure of the guarantor. And yet that drawing down might still be in violation of the plan document. I think the drawing down, per se, is not violative. I think what is violative is when they drew down the security and then characterized it, as they do in this case, as a plan asset, when their own plan document says they only, because they hold security. They have, for example, a cash escrow account. And they can, if they have to take beneficiaries in and the amount has been secured through a cash escrow, they'll draw the cash out of the, or the money out of the cash escrow account when they take in the beneficiaries. That's what you're referring to there, Judge Ginsburg, is when can security become an asset of the plan? It's not an asset of the plan just because it's provided. It's not paid to the plan as a premium or as a liability. In fact, over time, it's returned to the operators as their obligations go down. So the only time that they can take in the asset of the cash, which they received from this letter of credit, is if they bring in the beneficiaries into the plan and provide them benefits. Then they can use it, put it in as a plan asset, and use it to provide benefits for beneficiaries. So can I ask this question? If the security was drawn down and was used to pay benefits, then would there still be an obligation to replace the security? If the court rejects our statutory interpretation, that the... Right, so let's assume, I'm not even worried about related entities right now. Let's just assume it's the same. Let's just assume it's a 1988 signatory operator. I'm just saying that if the security is used, is drawn down on, I don't know if I'm using the right terminology, is drawn down on, and it's, the proceeds from that are used to pay benefits, then there's no security anymore. If it was used in the way that you think is the right way, then would you say at that point that there's no requirement to have a security in place? Or would you say, no, there's still a requirement to have a security in place? Well, the reason they would draw down security of any type to provide benefits is because the benefits aren't being provided. Right. So their first right would be to seek to compel the statutorily liable party, which in this case could be the operator or the related person, to actually provide the benefits. Because that is an obligation. Right. I'm just trying to get to a simple question. So if whatever, however this comes about, if what ends up happening is the security is used, is liquidated, and the proceeds are used to pay benefits, it's still a liability. It seems to me that there would still have to be a security in place. So then some entity would have to provide a security. Because that's only done for one year, and there's future benefits for future years. Those are going to have to be paid, and presumably the statute contemplates that there would be a security in place for the payment of those future benefits also. Well, Judge Sardossian, if they use the security to provide the benefits, then how would they come back to Arch and say, you have to pay the benefits and you have to pay for the same benefits? I'm not asking about who they're going to. I'm even talking about a subsequent year. I think the way I understand the way the security works, and I think this is what was said in response to Judge Ginsburg's question, is the security is designed to allow for the payments for one year. So let's just suppose that happens. They're still subsequent years. And as to those subsequent years, wouldn't there be a requirement to have a security in place to provide a backstop for the payment of benefits in those subsequent years, too? The statute doesn't require that. It simply says that the related person will provide a security. That's sort of the measure, if you will, the measure of damages or liability when the plan has to take in beneficiaries. Now, if the parties still exist that can be required to provide the benefits, then there could be actions taken against those parties to provide the benefits. For all the beneficiaries that the plan has itself provided benefits for. So whether one would characterize the receipts, for example, if the plan took in these beneficiaries, and then Arch later was sued successfully by the plan because it's a related person and should have provided the benefits, then what would the recovery be? Would it be just the obligation to provide, for Arch to provide benefits going forward from there on because the security was used to pay those benefits? Or would the obligation be to recharacterize, to collect from Arch the premiums it didn't pay and recharacterize the amount that the plan used instead from the security to provide the benefits, recharacterize that amount as the security? Because otherwise there would be a double payment. And there would be no basis to have double payment for the same beneficiaries for the same benefits. Let me ask you a question. Were there other co-applicants on the letter of credit? The letter of credit that was taken, the co-applicant, I think the only two signatory companies at that time on the letter of credit were Apogee and Hobet. The letter of credit was arranged by Patriot Coal, which was a new parent that was not a co-act entity, but it did arrange with its security company to provide the letter of credit and listed these two companies as co-applicants. That letter of credit at one time had a number of other companies on there unrelated to Arch that Patriot owned that had co-act obligations, too. So if you look at the letter of credit, some of them have a lot of co-companies on there, but the only ones being secured as of the time of the bankruptcy, as I understand it, were the two Arch subsidiaries. When Magnum bought, purchased the two subsidiaries, that's the only co-applicant on the letter of credit that was on the letter of credit. And that's the only co-applicant that was on the letter of credit that was on the letter of credit. And that's when Magnum, the letter of credit came as a result of that. Did Magnum produce the letter of credit by virtue of its purchasing Arch's two subsidiaries? Well, Arch, in that transaction, Arch obligated in the transaction documents for Magnum to replace the security that it had provided. Exactly. So couldn't Arch have protected itself from this situation by not agreeing to the clause in the letter of credit which allowed it to be drawn down if eventually Patriot went bankrupt? In other words, what I'm asking is, couldn't Arch have completely The problem for Arch here is the terms of the letter of credit, which it could have influenced back at Magnum's purchase of its subsidiaries. Isn't that right? The problem, yes. Yes, I think that's a fair statement. The letter of credit that the plan uses as its form letter of credit provides for a situation which the co-act itself doesn't. It provides that it can draw down, but it can't draw down. A letter of credit, if the signatory companies cease to provide a plan. But is that required in the letter of credit? It's not. Well, it is really. It is stated in the letter of credit that that is a term for. Correct. I got that. But could Arch have said we don't want that in there? Well, at that point in time, Arch had no connection to these companies. They had been sold. No, but Arch was negotiating. But Arch, wait a minute. Magnum bought Arch's two subsidiaries, right? Correct. Okay. It's at that point, couldn't it, that Arch could have said, as a condition of the sale, we want the letter of credit not to have that provision in there? Because we don't want the future liability of, we don't want to face the future problem of what happens if Magnum or its successor, Patriot, goes under. I don't think it could successfully have done that, because a letter of credit is actually a form letter of credit that the plan requires. Oh, well, I just asked you if the plan required it, and you said no. I wouldn't have asked my follow-up question if you had said no. Okay, so that letter of credit is required by the plan. That letter of credit, the appendix has a series of form letter of credits or security instruments that the plan will accept. And that is a provision in each type of security. And they also each provide for two alternative grounds for drawing down the security. I'm sorry, go ahead. Does each letter of credit provide two grounds, disjunctively, on which the trustee can draw down the credit? That's correct. Either ceasing to pay premiums or ceasing to operate. Ceasing to provide the benefits or the plan enrolls the beneficiaries. And that's the disjunctive problem that we have here is because the benefits never stop being provided, because ours has a statutory duty to provide the benefits, which it immediately accepted and assumed. But the letter of credit terms, which the plan exercised, says that, well, although the letter of credit is for the purpose of compensating the plan for a year's worth of benefits, if we have to take the people in, the letter of credit itself permitted them to convert this letter of credit into cash. And our whole point is the fact that it was converted to cash doesn't make it any less security. Cash is probably better security than a letter of credit. So their whole case and their whole theory here is to throw up their hands and say, well, but cash is not security. And that's just a diversion on their part, because a letter, a compliant letter of credit was provided. They exercised the right to take it. But now they want Arch to put up another one, and they still have the proceeds from that letter of credit. And the proceeds are what is intended by the act to serve as the recourse or resource for the plan in the event that it ever has to take these beneficiaries in. You didn't quite argue that a remedy is required to avoid an unjust enrichment, did you? We didn't specify that as a remedy. The trustees are charged, even in their own plan documents, with establishing the rules for security. In our view, we don't have an obligation to provide the letter of credit because it was provided. And even if we're a related, even if a related person is responsible for the credit, the act says that Arch is entitled to the letter of credit. Jointly and severally liable with such operator, that is, the signatory operators, for any amount required to be paid by such operator under this section. That happened. That was done. If you call a letter of credit, an amount required to be paid, to squeeze it in and make it a liability of Arch, then that amount required to be paid was paid. And we can't be made, based on a theory of joint and several liability as a related person, to be made a liability of Arch. We cannot be obliged to pay again what our co-obligor, the signatory companies, have already paid. So the problem lies... I hear you saying that. Pardon? I hear you saying that you cannot be obliged to pay again. We should not be. We should not be. And we hope the court will agree with us. But you're not able to pin that to any specific provision in the statute or in the plan documents. Well, yes. I think that the statutory section itself says that. Our obligation as a related person, even if we're obligated for security, is as a co-obligor with our subsidiaries, then subsidiaries, to provide a letter of credit. That's the statutory obligation. It was complied with. And the only reason we're here today is because the plan unilaterally took the letter of credit. We didn't terminate it. Nobody on the company side terminated the letter of credit. In fact, it was drawn down. So we were fully compliant and our co-obligors were fully compliant. And the plan acknowledges that, yes, we do have that cash. So they are the ones who are obligated. This is a case of First Depression. It hasn't happened before. They don't have a rule for this situation. They don't have a trustee resolution or anything that addresses this unique situation. Our position is it's up to them to decide how to treat it, but it is not our statutory obligation as an entity that may be required by virtue of a control group related person status to stand good for an obligation, to stand good a second time. I don't think I got this from the briefs. I thought you were asking for a remedy in which it did matter what they did with the money drawn down. Now you're saying it just matters that we don't have a second obligation here. Both, Your Honor. We don't have a second obligation. We don't have a... If we don't have to provide it... Then you don't care what they do with it. We don't care, but the reason we don't have to provide it is because we believe they should characterize it as security because that's what it was before they cashed it in, and that's what it is today. At some point it seemed to me you were arguing that it had to be used for the benefit of your attributable employees. It has to be used to provide benefits to our employees. Now that's different than just saying you don't care what they do with it as long as we don't have to replace it. That's an alternative argument. That's another reason why they are not entitled. It's part and parcel of the same problem. They aren't entitled to require another letter of credit. It's not part and parcel. You could get a remedy that says you don't have to put up a second security, or you could get one that says and the proceeds from the letter of credit must be dedicated to your attributable employees. They're not the same thing. Well, we would accept because we didn't take any position at all with the plan previously other than all our obligation is to all the plan's obligation, if it takes the letter of credit, before it can use the letter of credit, the proceeds from it, it's concomitant with an obligation to take in the beneficiaries. And they didn't do that. So they can't call it an asset, which is what they're doing here, as justification for requiring us to post another letter of credit. They're saying it's gone. It's an asset of the plan. But it can't be an asset of the plan because they haven't taken in the beneficiaries and the two things are joined. I think we're getting some repetition here. Why don't we hear from the other side and then I'll give you a couple of minutes, okay? Mr. Schuster. Thank you. Thank you and may it please the court. I'm Stephanie Schuster here on behalf of the Applebee's, the trustees of the 1992 plan. In its brief, at least, at pages 15 and 16 of the opening and 23 of the reply, Arch Cole concedes that the 9712 security requirement is a performance guarantee and it ensures performance of a company's obligation to maintain an individual employer plan under 9711. Arch also concedes that it is one of the companies responsible for maintaining an individual employer plan. Each of Arch's theories for an exemption from the concomitant duty to post a security to guarantee its performance is contrary to the plain language of the Cole Act. Starting first with the scope of related person liability, Arch, as a related person, is jointly and severally liable for any amount required to be paid that's per 9712 D4, under 9712 D. As a matter of ordinary meaning, amounts can be paid in different mediums. They can be paid in money, like the premiums the statute requires, or they can be paid in something else of value, like the security the statute requires. And indeed, in section 9712 and throughout the Cole Act, when Congress wanted to refer exclusively to premiums, it used a different, more specific phrase. It said any premium required to be paid. Congress used the broader phrase in situations where it wanted to reach other types of payments. As here, it said any amount required to be paid. For example, section 9704A requires operators to pay premiums and only premiums to the combined fund, so Congress made related persons jointly and severally liable for any premium required to be paid under that section. Can I ask a question about how this works out in practice under your view? So let's put aside this textual argument for a second. Let's suppose that there's a bunch of related entities that are possible. Then the way that you're construing the statute, as I understand it, is that when the signatory operator enters into bankruptcy, then that affords an occasion to draw down on the letter of credit. And then... It's the cessation of providing benefits under the IP. Okay. Correct. And then so then the plan then gets the proceeds of the letter of credit and then a new entity has to supply the security. Correct. So then the way you perceive it is we get to draw down on the letter of credit. We take those funds and we don't even need to use them to pay benefits. We can just do whatever we want with them. We treat them as an asset. And then let's suppose that the related entity that becomes a substitute provider of the security also goes under. So then I think the way you would construe it is, okay, then we get to draw down on the letter of credit that they, by hypothesis, supplied. We don't have to use it to pay benefits. We get to put it as an asset. Then another related entity comes in and also has to provide a security. And does it just keep going on forever so that the plan just kind of accumulates assets forever because... Not quite, Your Honor. And as Arch has pointed out, this is an unusual scenario, but it's one of Arch's own making. In the past, ordinarily, when a related person is going to take over a bankrupt entity, for example, it's COLAC obligations. That entity will arrange to either replace or take over the existing security. And they'll do so seamlessly so that it's effective on or around the date that they actually take over the IEP obligation. That ensures that there's no condition to draw is triggered. And we go ahead and release the existing security because we don't need to. But what happened here was different. Arch chose not to take over or replace Patriot Security not on November 1 of 2015 when it took over the IEP or in the 40 days that followed between when the plan eventually called the security, faced with a looming bankruptcy and an expiration of the existing letter of credit which had been triggered. So it doesn't quite happen that way. This is the only time because... So I get that, I guess. So that would mean that Arch, had Arch provided immediately assumed responsibility for the security, then the way you construed it as a plan would have had no occasion to draw down on the security? Yeah, it would have as a matter of prudence. It's only allowed one security for this obligation. It's not going to hold two. But then let's just suppose, I guess my question is, this unfolded the way that it did. And what ends up happening is the plan draws down on the security, takes those proceeds, and let's just suppose that they're not being used to pay the beneficiaries. Which I understand that there's not a dispute about that. But let's just assume that that's the case. Then you have that as an asset. And then you also have a security. So you have the asset which is an amount of funds that's there to supply benefits for a year. And then you also get a security that Arch is supposed to supply that is designed to do the same thing. Provide funds to pay benefits for a year. So there's two catches of money basically that are designed to do the same thing. And then let's suppose that another, that Arch goes bankrupt. And then the next related entity that's on the conveyor belt just takes the same position that Arch did. And then under your view, I take it the plan could do exactly the same thing again. They would draw down on the security. Then they would triple the amount that's there to pay off beneficiaries for a year. And then the next related entity would also have to supply a security. It's correct, Your Honor. If Arch were to go under and there was another related person and that related person were to take the same position and refuse to replace security that we hope Arch replaced. If they refused to do so and we were faced with the drawing condition having been triggered and money going on the table, then we would draw it, yes. If that related entity were to not do that and arrange to just replace the security, we wouldn't draw Arch's security. But you don't have, it's your choice whether to draw the security action. It's our choice constrained by fiduciary obligations. Right, okay, okay. So maybe you'd say, because if it's the related entity, is it a related person? I don't know the term. Related person. Okay, so the related person says we're going to take over the premium payments. Then the thing that the security is designed to guarantee is already being accounted for. What the security guarantees is the separate individual employer plan obligation. It's there to add a cost so that a company doesn't, when it chooses not to comply with the obligation to maintain an IEP, it doesn't just shift its burden to increase premiums. I see, okay. Right, it makes that decision have a cost. That's what the premium is there. It's the performance bond. I didn't catch all of that. If I understood what you said earlier, the Arch could have somehow coordinated its conduct with the exiting employer and avoided this problem? Is that correct? That's correct. Because you wouldn't have drawn down the security? Explain it again. That's the question I was going to ask. Certainly. So I can use an example. When Arch sold the subsidiaries at issue here to Magnum, it required pursuant to contract that Magnum either replace or replace security, the bond that Arch had posted. And Magnum did that. And then when Magnum sold the same subsidiaries to Patriot Coal, Patriot Coal ensured that effective on day one of its taking ownership of those entities, Patriot added those applicants to its existing letter of credit. And so we released the Magnum letter of credit. But what happened here, Arch took over the IEP obligation, but it made no arrangement to either pay to take over, arrange with Fifth Third Bank and Patriot to take over the obligation under the letter of credit or to post a new one under which we would have just as a matter of prudence released the existing Patriot as we've done with Magnum and Patriot beforehand. Did that clarify, Your Honor? Yes, I think so. And just to clarify one thing, it's not that the funds that we've called from the security are not just an asset not being used to pay benefits. They're an asset that must be used to pay benefits for all beneficiaries of the plan. It's that as a matter of our fiduciary obligations, we can't use them just to provide a credit to Arch. And as a matter of our fiduciary obligations, we have to use them for all beneficiaries, not just select beneficiaries. And the statute itself doesn't require that we devote the proceeds from a called letter of credit to paying benefits for any particular set of beneficiaries. We do that for all. But there are separate accounts maintained under the letter of credit at Bankers Trust, correct? Sorry, Your Honor? The lawyers each have some sort of an account or sub-account at Bankers Trust which is their debit as the amounts needed in the letter of credit change. They have. It depends on which of the three statutorily permitted forms they choose to use for security. If it's a letter of credit it's an arrangement. They post collateral or money to the bank and the bank issues the letter of credit. If it's a cash escrow, there is an account that they set up pursuant to a trust agreement with an acceptable financial institution. And in that one it's a specific cash escrow account, but not necessarily. There's a series of cases involving mistakes by the employer over contributing. Sure. Do those all necessarily involve the cash accounts as opposed to a letter of credit? A series of cases under the Cole Act or ERISA more generally? No, ERISA. Okay. I'm not aware so under ERISA, ERISA doesn't have this specific security requirement and this cash escrow bond letter of credit is specific to the 1992 plan under the Cole Act. So I'm not aware if those overpayment obligations are specific to just cash escrow. I can tell you that here, if an employer paid too much into a cash escrow or as it happens on an annual basis, we adjust the amount of security. As security changes, we will reduce the amount or if they post a letter of credit, they can post a replacement letter of credit or adjust the amount. Only on the anniversary? Only on the annual renewal? We do, yeah, just as an administrative matter, it's done every year. It's an ongoing, you know, you update the number of beneficiaries attributable to you so that changes the amount and you can change the form. ERISA contemplates, more generally, that if there's an overpayment, it can be adjusted within six months. ERISA may, yes, but at least as far as I understand. Exactly, within six months, the way it works is if the administrator denies the claim of overpayment, there's six months within which to appeal that. Understood, Your Honor. Here, we work with, it's a self-reporting obligation on the amount and the number of beneficiaries and when the amount goes down as unfortunately happens as this population dwindles, we adjust and we agree to adjustments of the letter of credit and the record shows with respect to Patriots, you know, constant adjustments over time, download adjustments. I see my time has expired. No, no, thank you. Thank you, Your Honor. Mr. Woodrum, we took you away over time, but you can take two minutes. Mr. Woodrum, why didn't you make, why didn't ARCH make the arrangements that would have avoided this problem? Because it would have required, it would have required ARCH to provide a letter of credit that had already been provided. What we are told is that you could avoid that by arranging with your predecessor in interest to have the security essentially assigned to you. Well, the predecessor in interest was bankrupt and the plan we informed... It was bankrupt, but there was a security interest over at the bank. It had a letter of credit It was not a letter of credit that ARCH was a party to, so the Was it in some way that other companies have avoided this situation? Well, ARCH avoided it when it sold the company because we, in exchange for part of the compensation for the sale of the company, one of the conditions was that the buyer would assume all of ARCH's bonding obligations, not just the COAC, but reclamation bonds and other obligations associated with these entities. So the difference here is that the security that its purchaser or its successor to the purchaser, Magnum, had posted, had been done pursuant to the private party agreements that it had, it was responsible for providing that security, and it did. I'm not sure I understand the distinction between the two things that are being discussed, which is, one, you could have in some way assumed a letter of credit that Patriot already had. And the second would be that that letter of credit goes away and then you supply a new letter of credit. Either way, it's a letter of credit that goes to your books. And so I take it from your standpoint, you're saying, I don't care if I assume the existing one or if I supply a new one, the bottom line is I shouldn't have to have anything to do with the letter of credit, period. We shouldn't have an obligation of the corporate self-ARCH to provide security, letter of credit, or whatever from that. The other is that that obligation was complied with. And so why would we if a plan is taken, we inform the plan as soon as the subsidiaries were closed or shut down, liquidated as part of the bankruptcy, we informed the plan that we would take over that liability. They didn't say anything about a letter of credit. All we knew was that a month or two later, they foreclosed on the letter of credit and in their briefs, they say they had a fiduciary obligation to do so. Because we weren't a party to that letter of credit, Patriot had arranged for it on behalf of those signatory companies and the letter of credit said that the plan can take the letter of credit if those operators cease to provide benefits. And they did, but what got missed by the plan or what the plan is glossing over is the fact that we immediately, because we also have a statutory duty to provide benefits, we took the beneficiaries on because we're a related person. That's the only reason we took them on is because And you notified the plan. And we notified the plan that they never paid a dollar for these people. And did the notification say anything about security? Our notification of the plan that we were taking on the beneficiaries? No, your honor, it just says, we just want to let you know that we are assuming the obligation to provide benefits to those retirees. In other words, you don't have to worry about it. They're not coming into your plan. We're taking them over. So the joint and several liability works both ways. If we have a joint and several obligation to provide benefits to the beneficiaries and to ensure that security is provided, then the fact that those two obligations were complied with benefits us as a related person because that's the source of the legal obligation in the first instance is because we don't have it. We didn't employ the people. But Congress said for these obligations, these specified obligations, you're secondarily liable. I think you said earlier on in the first argument that this was a case of first impression. It is, your honor. So why is that? What was different in this case from all the other transitions? Excellent question and I'm glad to shed some light on it. Usually when there's a bankruptcy, the parent goes down as well. That's happened in the Patriot bankruptcy. The parent liquidated as well. So even with coal companies, usually when a letter of credit has been provided, all of the responsible entities are liquidated and the beneficiaries come into the plan and the plan takes the security. It's happened with a number of bankruptcies in recent years that have become very common in the coal industry. This case is factually unusual because in this instance, the entities that went bankrupt didn't include all related persons because ARCH still existed and defined to be a related person based on that's the trigger date for establishing that relationship. So the trustees were just doing in this case what they do in every case before because in every other case there is no surviving LSO? Well, no, your honor. Because in every other case, they stepped in to provide the benefits and so they were entitled under the statute to take the security for the purpose for which it was provided and that was to provide for the retirees of the bankrupt company. What's the date on which they did that? Pardon? What's the date on which they did that? They did that in December. I don't recall the actual date. I think we provided notice in maybe October that we were going to take over. So the notice preceded the drawdown? The notice preceded the drawdown, correct. And our position was then, as it is now, that the drawdown is just a conversion of a letter of credit to cash and the cash still provides you the same security that you had through the letter of credit because you've yet to take in those beneficiaries. And if you take them in, then use the cash to provide their benefits. But that's not an option, taking them in, right? You're still on the hook. We're on the hook, that's correct. And we'll be on the hook as long as they live and as long as ARCH exists. So in effect, the plan has taken a windfall and they're using it for a purpose for which the security was never intended to be provided and, in fact, it conflicts with the actual language. So at this point in their logic, they invoke the anti-annulment rule. What's wrong with that? Well, because they haven't taken in the beneficiaries and the beneficiaries are what provide them the basis. I understand that, but allocating the money to the premiums or security for which you're responsible or would be responsible, would have been responsible, they say violates the anti-annulment rule. No, Your Honor, it doesn't because it's self-serving on their part to say that they've made it a plan asset. It wasn't a plan asset and so couldn't violate the anti-annulment rule when it was a letter of credit. It's their decision and action characterizing it as no longer security and therefore we can take it as an asset. So, voila, Parisa says we have to use it for the beneficiaries, but nothing requires them or really, in my view, even authorizes them to take the proceeds of that letter of credit into the plan as an asset and their own plan document says that they receive security from its status as security, converting it to a plan asset when they enroll beneficiaries and they haven't done it. So, therefore, the anti-annulment rule is not applicable here. Thank you. Anything else? Okay, thank you both. The case is submitted.
judges: Tatel, Srinivasan, Ginsburg